MARIAN L. MASTERS, APPELLEE, V. IOWA BEEF PROCESSORS, INC., APPELLANT.
374 N.W.2d 21

Filed September 20, 1985.   No. 84-796.

Wayne E. Boyd of Smith, Smith & Boyd, for appellant.

Patrick D. Kuehl and David A. O'Brien of O'Brien, Galvin & Kuehl, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

The defendant employer has appealed an award on rehearing of the Nebraska Workmen's Compensation Court. Defendant disputes the findings of the compensation court that plaintiff

sustained an accident arising out of and in the course of her employment by the defendant, that a causal connection existed between the alleged accident and plaintiff's injuries, that the plaintiff was still suffering from temporary total disability, and that a waiting time penalty should be paid. We affirm.

Marian L. Masters began working for Iowa Beef Processors, Inc. (IBP), on September 12, 1983. Two days later she began her job as a "brisket boner," wherein she pulled pieces of meat off a line with a meathook, made several cuts, and pulled the meat apart. On September 21, while still in her training period and working at only half speed, the plaintiff injured her left hand. "I did the trim and went to pull it apart and something snapped in my hand and it just — It's like somebody took a rubberband and snapped it on top of the skin and just left it go. It was very painful, numb, burning."

After a brief wait plaintiff continued working until her supper break, although the pain worsened. She then went to the dispensary, where the nurse told her the pain would go away in a couple of weeks and that she should have the hand wrapped every day. She went back to work and completed her shift. She continued working through September 26, and during that time the pain worsened. Her fingers turned white and swelled, and numbness spread up her arm.

On September 26 she began working at full speed, but after a while she was unable to keep up. She again felt snapping in her hand, and eventually she went to the dispensary to obtain a slip in order to see a doctor. The next morning she saw a physician, who put her on light work with no stress to the wrists. She went back to work, and after she refused one job requiring substantial pulling, she was placed on a trim line. This required her to reach out and pull pieces of meat off a line. She continued this work on September 28 but was warned that she was not doing a good enough job. On September 29 she was fired.

On September 30 she saw another physician, Dr. Hoelting, who prescribed complete rest and medication for her injury. She returned to her doctor on October 11 and was examined by another physician, Dr. Garred. After obtaining a medical history and testing the patient, Dr. Garred determined that the plaintiff suffered from carpal tunnel syndrome. He then

performed a carpal tunnel release, which confirmed his diagnosis. Plaintiff rested for approximately 2 weeks and then began physical therapy.

Dr. Garred saw the plaintiff again in December of 1983 and placed her on more strenuous physical therapy, as he was concerned that she was not doing well. Plaintiff's condition improved rapidly after that. She saw a neurologist, Dr. Isgreen, in March of 1984, who did a series of tests on her left arm. He found some weakness, "more diffuse weakness than one would imagine on the basis of simple carpal tunnel problems"; however, his only diagnosis was carpal tunnel syndrome.

The plaintiff, who was still undergoing physical therapy, returned to see Dr. Garred in mid-May. She complained of tightness in her arm, starting at her elbow, as well as swelling in her fingers, which resulted from increased physical activity. At that time Dr. Garred suspected a "pronator syndrome," and referred her to Dr. Linscheid at the Mayo Clinic. On June 7 she was examined at the Mayo Clinic and was diagnosed as suffering from pronator teres syndrome. Dr. Linscheid operated on her to relieve the problem, and at the time of the rehearing, June 21, 1984, she was still recovering from the surgery.

Following a one-judge hearing, the compensation court awarded plaintiff temporary total disability, medical expenses, waiting time penalties, interest, and attorney fees for injuries which it found to have arisen out of an accident while the plaintiff was employed by the defendant.

The defendant, IBP, requested a rehearing. On rehearing, the three-judge panel found that on September 21, 1983, the plaintiff sustained injuries "while engaged in the duties of her employment." The court found that both the carpal tunnel and the pronator teres syndromes were causally related to the accident which occurred on September 21 and that no reasonable controversy existed concerning plaintiff's right to recovery. The panel granted temporary total disability of $157.33 per week, existing and future medical expenses, waiting time, and attorney fees. One judge dissented, finding that no causal relationship was proven as to the pronator teres syndrome.

The findings of fact made by the Nebraska Workmen's Compensation Court after rehearing will not be set aside on appeal unless clearly wrong.

In testing the sufficiency of evidence to support findings of fact made by the Workmen's Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor, and he should have the benefit of every inference that can reasonably be drawn therefrom. *Allen v. IBP, Inc.*, 219 Neb. 424, 363 N.W.2d 520 (1985). See, also, *McLaughlin v. Self-Insurance Servs.*, 219 Neb. 260, 361 N.W.2d 585 (1985).

As provided for by Neb. Rev. Stat. § 48-151(2) (Reissue 1984), "accident," as used in workmen's compensation law, shall

> be construed to mean an unexpected or unforeseen injury happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. The claimant shall have a burden of proof to establish by a preponderance of the evidence that such unexpected or unforeseen injury was in fact caused by the employment. There shall be no presumption from the mere occurrence of such unexpected or unforeseen injury that the injury was in fact caused by the employment.

In order to sustain the burden of proving an accident as well as causation, the evidence presented by the claimant must be definite and certain to warrant a compensation award. *Scott v. State*, 218 Neb. 195, 352 N.W.2d 890 (1984).

In *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982), the claimant suffered from an ailment diagnosed as "lateral epicondylitis." The onset of the condition followed the employee's assignment to a job which required her to lift and turn over stacks of cardboard sheets. Her physician testified that her condition was the result of repetitive flexion and extension of her hand and wrist due to her employment. We held that such condition amounted to an accident because the injury was unexpected or unforeseen, the injury produced immediate objective symptoms, and it happened suddenly and violently.

It is quite apparent from the record, through the testimony of the plaintiff as corroborated by a coworker, that plaintiff's injury satisfied the three-prong injury test of *Sandel*.

We next turn to the question of causation as to both the carpal tunnel syndrome and the pronator teres syndrome. Because this is predominately a question of fact, it is necessary for us to examine the medical testimony.

The only "testimony" from Dr. Linscheid, who made the positive diagnosis of pronator teres syndrome and who performed the corrective surgery, was in the form of a letter of report to Dr. Garred on June 25, 1984. He made absolutely no reference to causation, and apparently no attempt was made to obtain an opinion from him in this regard.

The plaintiff's initial medical examination was made by the Pender Clinic, Drs. Muffly and Hoelting, on September 27. There is no information from these physicians relating to causation.

Dr. Garred, a surgeon specializing in hand surgery and reconstruction, first examined plaintiff on October 11, 1983. His examination confirmed Dr. Hoelting's suspicions that she was suffering from carpal tunnel syndrome, and a surgical release was performed on that same date.

Dr. Garred testified by deposition as follows:

MR. KUEHL: I'm handing you, Doctor, what has been marked Exhibit 2. And then you've indicated that that is just some of your notes from your file.

A. Uh-huh.

. . . .

Q. Do you know what type of work Marian Masters was doing at IBP?

A. No. I only know she had something to do with handling meat and that she had multiple — and as I stated here, multiple flexion and pronating exercise is probably part of the problem for most of the aggravation of the entrapment situation she had.

Q. So if she was using her left hand with a hook to grab meat and to pull it in, is that something consistent with carpal tunnel syndrome injury?

A. It can be. Multiple trauma. The main problem for

entrapment — nerve entrapment is usually trauma. Not always, but usually.

Q. Did she indicate to you that when this occurred that she had — she was pulling the hook and had a snapping, burning feeling in her wrist and hand?

A. No, sir. But that history is somewhere in some of my records but I don't know where it is.

. . . .

Q. Is the carpal tunnel syndrome and the pronator teres related in any way at all?

A. Oh, I think she had both problems. And after the carpal tunnel release was completed then I think we recognized the pronator teres and we recognized it because she began becoming more active with the arm again after the carpal tunnel release was done.

. . . .

Q. . . . So, you indicate that you felt that at the time of the carpal she also had the pronator teres?

A. I think so. I think that's probably true.

Q. Is some of the symptomatology the same?

A. Yes. Very much. Very similar. It is hard to sort it out sometimes. . . .

. . . .

A. . . . And in my letter [to Dr. Linscheid] I told him I felt she had a pronator teres syndrome and she was willing to come up. I said in the letter — I think this is still a leftover problem with she had her original carpal and part and parcel of the same.

Dr. Garred, after stating, in response to a question, that he did have an opinion based upon reasonable medical certainty as to whether plaintiff's injuries were the result of her work, was asked and answered:

Q. And what is that opinion?

. . . .

[A.] Okay. I think it is not physiologic for people to do some of the things they do in production lines, and this may be one of the problems. And it could also be that Iowa Beef Packers might design a handle that might — or a different technic that might prevent repeated joint

motions. And as I understand these things, this is a long-term repetitive motion during the work period with no let up. And I think on that basis that's where it comes.

Now, when you talk about trauma with a carpal tunnel, the first thing that occurs is that there is an anoxia. And that's the physiologic basis for the beginning of it. Following anoxia you get a swelling and then you have an enclosed rigid place and it produces a pile up of problems. I could go into, if you wanted to, the physiology of the cell and talk about acetylcholine levels, which is some of the physiology of the nerve. And when this is distrubed [sic] then it seems to keep — and if the person goes back day after day to this, then it keeps increasing it. And the person usually has numbness first because the nerve is a mixed nerve and has both sensorium and motor nerves in it. And the weaker action zones are the — are probably the central nerves, and they start to fail first and then the motors start to die after that. And that's about the basis for it. And I think it is physiological.

Dr. Garred was also asked if working at her job for but 6 days was sufficient time for the carpal tunnel and the pronator teres syndromes to develop, and he answered that it was.

Gerald Newman, a licensed physical therapist who treated the plaintiff, suspected as early as December 10, 1983, the possibility of a pronator teres syndrome.

Dr. Isgreen, a neurologist, examined the plaintiff for the defendant's insurance company on March 12, 1984. He stated that the normal causes of carpal tunnel syndrome are repetitive motions, repeated trauma, and repeated flexing and extending of the wrist. He also stated that plaintiff's story of a snap and sudden onset of a burning sensation is typical of damage to a nerve.

We agree with the compensation court that the medical evidence as to causation as to both the carpal tunnel and the pronator teres syndromes is not as clear and precise as we would like to see it be. However, we also conclude that there is sufficient evidence to support the finding of that court, and under the scope of review which we are required to follow, we must affirm its decision.

We reach the same conclusion as to a continuing award of temporary total disability benefits. Although Dr. Isgreen felt that her disability was permanent, it must be remembered that he testified by deposition on May 15, 1984, which preceded plaintiff's surgery for pronator teres syndrome.

Dr. Garred, on the other hand, testified that he did not know whether plaintiff could continue the same work, and did not know whether her disability would be permanent, because it would take a longer period of following the case to make those determinations.

Plaintiff herself testified that she had not been released by her physicians and physical therapist because she could not find a job she could do with only one hand.

Also, because the compensation court found that there was no reasonable controversy as to compensability for the carpal tunnel syndrome, it awarded additional compensation of $78.67 per week waiting time to May 12, 1984, when the pronator teres syndrome controversy arose, and an attorney fee of $500, under the provisions of Neb. Rev. Stat. § 48-125 (Reissue 1984).

Although defendant's counsel, understandably, astutely avoided questioning the medical witnesses on the issue of causation, and plaintiff's counsel refused to pursue some of the rather vague answers given by the same witnesses, we believe that defendant's own physician, as quoted above, left little doubt as to the compensability of the carpal tunnel syndrome.

Accordingly, we affirm the judgment of the Workmen's Compensation Court. Plaintiff is awarded a fee of $1,000 for her attorney for services in this court.

AFFIRMED.

CAPORALE, J., concurring.

I agree with the result in this case, as the record, weak as it is, supports the finding of a causal relationship between the snapping in plaintiff's hand and the carpal tunnel and pronator teres syndromes. I write separately only to express the view that this case is distinguishable from *Sandel v. Packaging Co. of America*, 211 Neb. 149, 317 N.W.2d 910 (1982). Here, the snapping in plaintiff's hand satisfies the definition of accident as defined in Neb. Rev. Stat. § 48-151(2) (Reissue 1984). That

occurrence constitutes an "unexpected or unforeseen injury happening suddenly and violently," which produced at the time of its happening "objective symptoms of an injury." In *Sandel* there was no such trauma. I therefore would have chosen not to use *Sandel* as support for the result reached in the present case. The same can generally be said about *McLaughlin v. Self-Insurance Servs.*, 219 Neb. 260, 361 N.W.2d 585 (1985).